Chief Judge Breitel.
The State seeks to recover $3,892.56 from defendant Wilkes on three promissory notes issued by Wilkes as evidence of his obligation to repay National Defense Student Loans made by the State over a nine-year period. Wilkes asserts, as a complete defense, his discharge in bankruptcy. Each party moved for summary judgment. Special Term granted summary judgment to defendant, and a divided Appellate Division affirmed.
The issue is whether student loans which need not be repaid if the debtor dies, becomes disabled, or decides to teach in specified schools are, despite the contingencies, provable, and therefore dischargeable, debts within the meaning of the Bankruptcy Act (Bankruptcy Act, § 17; US Code, tit 11, § 35; Bankruptcy Act, § 63; US Code, tit 11, § 103).
The order of the Appellate Division should be reversed, defendant’s motion for summary judgment denied, and plaintiffs cross motion for summary judgment granted. Although a close question is presented, it is concluded that the various conditions attached to the student loans make the obligation to repay dependent on a series of events so speculative as to make valuation, in any realistic sense, impossible. Hence, at the time of the bankruptcy discharge there existed no provable debt, and Wilkes’ obligation to the State survived the discharge.
Between 1960 and 1963, Wilkes received three advances, totaling $975, under the National Defense Student Loan Program. In return for these advances, Wilkes executed two promissory notes, containing similar terms, under which he agreed to repay the notes, with 3% interest, over a 10-year period beginning one year after he ceased being a full-time student. Of major significance, however, is that the unpaid indebtedness would be canceled in the event of Wilkes’ permanent disability or death, and would be reduced at the rate of 10% of the unpaid balance for each year that Wilkes served as a full-time teacher in a public elementary or secondary school, up to a maximum of 50% of the total principal plus interest.
On January 31, 1968, Wilkes executed another promissory note, by the terms of which he agreed to repay the total amount indicated on the included schedule of advances. Three advances, totaling $3,000, were made, scheduled, and indorsed by early 1969. This later promissory note, like the earlier ones, excused repayment entirely in case of death or disabil *657 ity, and up to 50% if Wilkes served as an elementary or secondary school teacher. But, in addition, it provided that Wilkes could reduce the amount of the note by 15% for every year of teaching in specified low-income areas, or of teaching the handicapped. No limit was placed on such reduction. Hence, Wilkes could avoid repaying the entire amount of the note by engaging in certain kinds of teaching.
Wilkes received his B.S. degree from the State University at Albany in June, 1968, and studied for a Master’s degree until June, 1969. In September, 1969, defendant became employed by the State Education Department. On January 25, 1970, at a time he was earning an annual salary of $9,000, Wilkes filed a petition in bankruptcy. The only obligations scheduled were student loans exceeding $6,000 and three separate disputed charge account balances, which, in the aggregate, amounted to $158.48. Hence, it appears that the bankruptcy petition was filed solely to avoid repayment of student loans. No payments on the loans at issue in this case had yet become due. The State did not file formal objections to the discharge, and did not file a proof of claim.
Wilkes filed his petition and received his discharge before the 1970 amendments to section 17 of the Bankruptcy Act became effective. As a result, unlike a bankruptcy court under current law, the bankruptcy court in this case was not empowered to determine the dischargeability of any individual debt (see Bankruptcy Act, § 17, subd [c]; US Code, tit 11, § 35, subd [c]; 1A Collier, Bankruptcy [14th ed], pars 17.28, 17.28A). That determination, under the law governing this case, was one reserved for State courts. And even after the 1970 amendments, the State courts retain the power, subject to statutory exception, to determine the effect of a discharge (see Bankruptcy Act, § 17, subd [c]; US Code, tit 11, § 35, subd [c]; Chevron Oil Co. v Dobie, 40 NY2d 712, 714-715, mot for rearg den 40 NY2d 1093). Hence, the issue in this case is appropriately before this court.
Only provable debts are dischargeable in bankruptcy (Bankruptcy Act, § 17, subd [a]; US Code, tit 11, § 35, subd [a]). In general, contingency of an obligation is no bar to provability (Bankruptcy Act, § 63, subd [a], cl [8]; US Code, tit 11, § 103, subd [a], cl [8]). If, however, an unliquidated or contingent claim "is not capable of liquidation or of reasonable estimation”, that is, valuation, then the claim may not be allowed (Bankruptcy Act, § 57, subd [d]; US Code, tit 11, § 93, subd [d]). *658 And a contingent claim that has been proved but which has not been allowed is deemed to be not provable (Bankruptcy Act, § 63, subd [d]; US Code, tit 11, § 103, subd [d]). Hence, on parallel reasoning it may be concluded that if the claim, as in this case, would not have been allowable if a proof of claim had been filed because it is not susceptible of "liquidation or of reasonable estimation”, then it is not dischargeable.
In Maynard v Elliott (283 US 273, 278), still the primary precedent in this area, although decided before contingent debts were explicitly made provable by statute, the Supreme Court noted that a "contingency of the bankrupt’s obligation may be such as to render any claim upon it incapable of proof. It may be one beyond the control of the creditor, and dependent upon an event so fortuitous as to make it uncertain whether liability will ever attach. * * * Or, the contingency may be such as to make any valuation of the claim impossible, even though liability has attached.” In that context Mr. Justice Stone, as he then was, illustrated the rule by nondischargeable obligations to pay a divorced wife an annuity so long as she remained unmarried.
The loan agreements involved in this case are fraught with conditions, almost all of which are beyond the control of the creditor. Death or disability of the borrower terminates the borrower’s obligation to repay. This contingency alone might not make the State’s claim incapable of reasonable estimation. But, by teaching, the borrower can avoid repaying most or all of his debts. No readily available actuarial tables exist to estimate the possibility that Wilkes might decide to teach at some point, or where. Taken together, therefore, the conditions make the ultimate amount of liability impossible to ascertain or even to approximate.
At the time the petition in bankruptcy was filed, no payments had yet become due. Wilkes had not yet defaulted, and as a consequence, there was nothing due and owing on that date. Whether anything would ever become due was still a fortuity, a fortuity still to occur in the future. Had the State filed a claim in bankruptcy, the claim would not have been allowed.
Critical under the teaching of Maynard v Elliott (supra) is that the decision whether the condition will be fulfilled lies exclusively within the control of the student, not the lender, with a period of more than 10 years in which to fulfill it completely.
*659 Moreover, this loan agreement is not a commercial transaction. The State did not weigh the benefits of having the student borrower teach against the benefits of having the loan repaid. If such a balancing process had been used, this would be a different case, for the value to the State of having Wilkes teach might be equated to the value of having him repay the loan. But no such weighing occurred. Wilkes could reduce his repayment obligation by teaching in any State in this country. New York State receives no measurable economic benefit from such an agreement to teach in the future. Hence, any attempt at valuing the teaching obligation by reference to the amount of the loan is unavailing.
In recent years, an increasing number of student borrowers have chosen to extinguish their loan obligations through bankruptcy rather than through payment. The number of student loan bankruptcies has increased from a cumulative total of 2,146 for an aggregate of $2.4 million from the beginning of the student loan program through fiscal 1972, to an accumulated total of 8,969 for an aggregate of $11.3 million by February, 1975 (Senate Report No. 94-882, 94th Cong, 2d Sess, US Code Congressional & Administrative News [1976] 4713, 4744). Yet no reported cases dealing with the contingency issue have been cited or found.
In reaction to the growing problem, Congress has restricted the effect of a bankruptcy discharge on insured student loans outstanding, at the time of bankruptcy:
"Five-year nondischargeability of certain loan debts; effective date.
"(a) A debt which is a loan insured or guaranteed under the authority of this part may be released by a discharge in bankruptcy under the Bankruptcy Act only if such discharge is granted after the five-year period (exclusive of any applicable suspension of the repayment period) beginning on the date of commencement of the repayment period of such loan, except that prior to the expiration of that five-year period, such loan may be released only if the court in which the proceeding is pending determines that payment from future income or other wealth will impose an undue hardship on the debtor or his dependents.
"(b) Subsection (a) of this section shall be effective with respect to any proceedings begun under the Bankruptcy Act on or after September 30, 1977” (Education Arndts of 1976; *660 Public Law No. 94-482, § 127; 90 US Stat 2141; US Code, tit 20, § 1087-3).
While this provision is prospective in effect, and hence does not apply to this case, it reflects a strong legislative reaction to the resort to bankruptcy of student loan borrowers and the intention to block frustration of the purposes of the national student loan program.
Deciding whether a claim is sufficiently definite to be provable under the Bankruptcy Act is often difficult. The statute provides guidance that is, at best, vague. Much depends on the circumstances. In this kind of case, allowing discharge would thwart the purposes of student loan programs. Discharge in this case, then, would be out of harmony with the basic purpose of the Bankruptcy Act, which is to relieve honest debtors of the crushing burdens of heavy debt (see Brown v O’Keefe, 300 US 598, 606). No such burdens attend this debtor. Thus, construing the vague provisions of the statute to effect the basic statutory purpose, discharge should not be allowed in this case.
Accordingly, the order of the Appellate Division should be reversed, with costs, defendant’s motion for summary judgment should be denied, and the State’s cross motion for summary judgment granted.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order reversed, etc.